FILED
2014 Dec-15  PM 03:11
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GRADY L. BAKER,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Civil Action Number |
| **v.** | ) | **2:13-cv-00222-AKK** |
| | ) | |
| **SUPREME BEVERAGE** | ) | |
| **COMPANY, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Grady Baker, an African-American, pursues this lawsuit against his former employer, Supreme Beverage Company, Inc. ("SBC"). Doc. 1. Grady alleges that during his employment, SBC denied him overtime pay, subjected him to a racially hostile work environment, and subsequently discharged him in retaliation for his complaints about overtime and/or because of his race. *Id*. Accordingly, Baker pursues claims for alleged violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq*., and 42 U.S.C. § 1981. Before the court is SBC's Motion for Summary Judgment, doc. 36, which, for the reasons stated below, is due to be

granted.[1] At this juncture, however, the court notes that Baker's strongest claims is the hostile work environment claim. According to Baker, he was subjected repeatedly to racially offensive language by one of his co-workers and a supervisor. Doc. 38-1 at 81, 89, 91-92. Unfortunately for Baker, because he never complained about the alleged conduct, despite receiving SBC's anti-harassment policy, doc. 38-1 at 90, 91, 157, 167; doc. 38-3 at 12, there is no relief available to him against SBC for the alleged conduct, *see Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1366 (11th Cir. 1999).While Baker may think this is a harsh result, as the Eleventh Circuit has noted regarding workplace harassment:

> We are not unmindful of the enormous difficulties involved in lodging complaints about discrimination in the workplace, including complaints of . . . harassment. We also recognize the great psychological burden it places on one who is already the victim of harassment to require that person to complicate further his or her life with the ramifications, both legal and otherwise, of making a complaint. Federal law has now attempted to correct the problem of workplace discrimination, but it cannot be done without the cooperation of the victims, notwithstanding that it may be difficult for them to make such efforts. When an employer has taken steps, such as promulgating a considered [anti-]harassment policy, to prevent . . . harassment in the workplace, an employee must provide adequate notice that the employer's directives have been breached so that the employer has the opportunity to correct the problem.

---

[1] Also before the court is SBC's motion to strike portions of Baker's affidavit that are allegedly inconsistent with his deposition testimony. Doc. 56. Except for paragraphs 24 through 26 and 28 of the affidavit, doc. 51-1 at 5-6, which Baker concedes are due to be stricken, and are **STRICKEN**, the court **DENIES** the motion because the remaining paragraphs in contention ultimately have no impact on the court's summary judgment decision.

*Id*. Therefore, despite evidence of clear severe and pervasive racial harassment in this case, as explained more fully below, the hostile work environment claim also fails due to Baker's failure to utilize SBC's complaint procedure.

## I. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To support a summary judgment motion, the parties must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). Moreover, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it

in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*,

398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable

inferences must be drawn in the non-moving party's favor). However, "mere

conclusions and unsupported factual allegations are legally insufficient to defeat a

summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir.

2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560,

1563 (11th Cir. 1989)). Furthermore, "[a] mere 'scintilla' of evidence supporting

the opposing party's position will not suffice; there must be enough of a showing

that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573,

1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. FACTUAL BACKGROUND

This action arises from Baker's employment as a delivery truck driver for

SBC. Below are the relevant facts for summary judgment purposes with all

reasonable doubts resolved in favor of Baker, organized as they relate to (a) the

alleged unpaid wages and retaliatory discharge and (b) the alleged discrimination

and harassment.

## A. Baker's employment and discharge

From May 6, 2010 until June 18, 2012, Baker worked as a delivery truck driver for SBC, a wholesale beverage distributor that sells and delivers primarily beer and energy drinks to restaurants and retail outlets in Alabama. Doc. 38-30 at 1; doc. 38-31 at 2. Baker describes that, on a regular workday, his position required that he arrive at SBC's warehouse at 5:30 a.m., obtain an invoice that details the items on his truck (shrink-wrapped pallets of beverages), count the items (which SBC's warehouse personnel would load onto the truck the preceding workday), confirm that the items in the truck match those on the invoice, and deliver the items on the truck to the appropriate "customer stops." Doc. 38-1 at 16. Once he completed his stops for the day, Baker would return to the warehouse and "check in" to account for payment or returned product. *Id*. at 24. If a driver could not complete his stops,[2] SBC's policy required that he "let management know," get a forklift driver to unload the truck, wait until "someone in management comes over and checks [to make] sure all the beer is there, and then the driver . . . takes the pink ticket copy [of the invoice] upstairs in the warehouse to the check up lady." Doc. 51-1 at 6. The "check up lady" would then call management in the warehouse "to be sure the pallet of product is actually there," "the pallet is then re-keyed to produce another invoice with changed route and date," and the undelivered order

---

[2] Typical reasons for returning a stop include situations where a customer refused the order or canceled part of the order, or where the driver did not deliver items at a previously designated delivery time. Doc. 38-1 at 24; doc. 38-26 at 8.

typically gets "[rolled] over to the next day." *Id*. Baker performed these duties generally until June 18, 2012, when SBC discharged Baker for purportedly failing to complete his deliveries on the prior workday, June 15, 2012. Doc. 38-1 at 2. Baker, on the other hand, claims that retaliatory animus motivated his discharge—specifically that his supervisors "were out to get [him]" because he demanded overtime wages on June 15, 2012 and on multiple previous occasions. Doc. 38-1 at 117; doc. 51-1 at 3.

Turning to the events of June 15, 2012, when Baker arrived at work at 5:30 a.m., he realized that he had "two customer stops more than usual" and believed that he would not have time to deliver the last two stops unless he worked for twelve to thirteen hours. Doc. 38-1 at 64; doc. 51-1 at 4. According to Baker, he "was not feeling well" that day, and his supervisors knew that he was undergoing treatment for diverticulitis. Doc. 38-1 at 64; doc. 51-1 at 7. Throughout the day, Baker purportedly notified warehouse managers Josh Lankford and Buster Tate[3] that he could not complete the last two stops because he was not feeling well, and he told Lankford that completing the last two stops would take until "6:00 or 7:00 [p.m.], [when] he got there at 5:30 [a.m.]." Doc. 38-1 at 64-66. Purportedly, Lankford told Baker that "he didn't have nobody [else]" to complete the stops, and

---

[3] Tate claims that he never spoke with Baker that day, doc. 38-26 at 10, and Lankford denies that Baker stated he was not feeling well, doc. 38-18 at 11. While Lankford maintains that Baker "never gave a reason why" he would be returning the stops, *id*., Alan Creel, another warehouse manager, testified that Lankford told him on June 18, 2012 that Baker did not complete his stops because he "had something to do," doc. 38-16 at 18.

Tate told Baker, "Do what you can do."[4] *Id*. at 65, 66. At 5:30 p.m., after "working twelve hours . . . [when he] was not feeling well," Baker decided to return the undelivered pallets remaining on his truck because he believed completing the deliveries would require an additional three hours of work. Doc. 51-1 at 5. In doing so, Baker claims he followed the proper procedure for returning the stops. *Id*. at 6. Specifically, a forklift driver unloaded the undelivered pallets and "set [the pallets] on the floor for them [to] take a picture of [the pallets]," another warehouse worker "signed that [the ] beer [was] back in [the] warehouse," and Baker "[went] up and [checked] up" with the "check up lady,"[5] *Id*. Additionally, earlier that day, because company "protocol" required that he inform the salesman for the undelivered product, Baker claims he notified the appropriate salesman, Charles Rose, that he could not complete the stops. Doc. 38-1 at 65. According to Baker, he "could not check up and go home until the check up lady and [his] paperwork matched," and he "made sure" to follow this procedure because, otherwise, "he would have to pay for [the undelivered items]." Doc. 51-1 at 6-7.

The next workday, June 18, 2012, warehouse supervisor Alan Creel notified Baker that his employment was terminated as a result of the events that took place

---

[4] Lankford claims he told Baker that failing to complete his deliveries would be "unacceptable." Doc. 38-18 at 11.
[5] The "check up lady" at this point apparently contacted Alan Creel, who was seemingly the only warehouse manager present in the warehouse at that time, and informed him that Baker did not complete the last stops. Doc. 38-16 at 17. While Creel claims he was not aware that Baker would be returning any stops, *id*., Lankford testified that he informed Creel earlier that day that Baker "wasn't going to be making the stops," doc. 38-18 at 11.

on June 15, 2012.[6] *Id*. at 2. Because Baker maintains that he followed the proper

procedure for returning the undelivered pallets, he describes another set of events,

which he believes truly motivated the decision to terminate his employment.

Specifically, Baker claims that he "got on [his supervisors'] nerves" in "asking so

much" and complaining about unpaid overtime wages. Doc. 38-1 at 117. Baker

purportedly complained about overtime "for two years" on "more than ten"

occasions, and he recounts three specific incidences when he complained about

overtime to three different supervisors, including Lankford and Creel. *Id*. at 110,

112, 118. One of these incidences took place on Baker's last workday: when Baker

realized that morning that he would not be able to complete his without working an

additional two to three hours, he told Lankford, "Y'all don't want to pay me no

overtime . . . I'm not going to be able to do them other stops." Doc. 38-1 at 111.

On the same day, Baker's coworker, Alan Lowe, purportedly overheard Lankford

speaking with Marshall Nichols (SBC's Director of Operations) about discharging

Baker, prompting Lowe to opine that "they were out to get [Baker]." Doc. 51-1 at

1-2. Lowe also told Baker that in May 2012, he overheard Lankford telling Creel

that Baker "was getting to be a nuisance about talking about overtime in front of

other employees." *Id*. at 2.

---

[6] Creel claims Baker stated on June 18, 2012 that he returned the stops because "he was trying to get to a graduation for a family member." Doc. 38-16 at 21.

**B. Discrimination and harassment**

To support his claims of discrimination and harassment, Baker relies in part on his coworker Lowe, who purportedly overheard Creel, Lankford, and warehouse worker Mike DeArman "discussing how Buster Tate, African-American warehouse manager, would allow [Lowe] to help [Baker] make deliveries . . . and [how] them 'n*****s' must be [in] cahoots." Doc. 51-1 at 4. Baker also maintains that he heard "the word 'n*****' used at [work] all the time." *Id*.

## III. ANALYSIS

The court has considered Baker's claims and the parties' respective contentions and agrees with SBC that it is entitled to summary judgment on all of Baker's claims. The court addresses the FLSA unpaid overtime and retaliation claims first, and the Section 1981 disparate treatment and hostile work environment claims second.

### 1. *FLSA unpaid overtime and retaliation claims*

SBC raises two arguments with respect to Baker's FLSA claims: (a) that the FLSA's overtime requirement does not apply to Baker pursuant to the motor carrier exemption; and (b) that Baker cannot establish a prima facie case of retaliation. The court agrees with both arguments and addresses each in turn.

### a.  Unpaid overtime and the motor carrier exemption

While the FLSA requires employers to pay employees at an overtime rate if they work more than forty hours during the workweek, 29 U.S.C. § 207(a)(1),  it also provides a number of exemptions to the overtime provision, *see* 29 U.S.C. § 213(b)(1)-(30). Relevant here is the motor carrier exemption, which exempts from the overtime pay requirement "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49 [the Motor Carrier Act ("MCA")]." 29 U.S.C. §213(b)(1). Section 31502 of the MCA authorizes the Secretary of Transportation to "prescribe requirements for . . . qualifications and maximum hours of service of employees of" a motor carrier or a private motor carrier. 49 U.S.C. § 31502(b)(1)-(2). This provision applies to "transportation . . . described in" 49 U.S.C. § 13501. 49 U.S.C. § 31502(a)(1). In turn, Section 13501 confers jurisdiction on the Secretary of Transportation over transportation by a motor carrier "on a public highway," to the extent passengers, property, or both are transported by motor carrier "between a place in  . . . a State and a place in another State" or "a State and another place in the same State through another State." 49 U.S.C. § 13501(1)(A)-(B).

In this Circuit, to establish that the motor carrier exemption applies, the employer must first show that it is (1) a common carrier by motor vehicle, (2)

engaged in interstate commerce, and (3) whose activities directly affect the safety of operations of such motor vehicles. *Walters v. Am. Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1226 (11th Cir. 2009). Next, because the applicability of the exemption also depends on the "class of work involved in the employee's job," *id*. at 1227, "the employee's business-related activities must directly affect . . .  the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the [MCA]," *id*. at 1226.

Baker concedes that SBC is a "motor carrier," doc. 51 at 13, "that the DOT is authorized to regulate the safety of [SBC's] . . . operation," and seemingly concedes that SBC's activities directly affect the safety of operations of motor vehicles.[7] *See id*. at 24. Therefore, the only points of contention are: whether SBC engages in interstate commerce, and whether the class of work involved in Baker's job directly affects the safety of operation of motor vehicles. *See id*. at 12, 24.

    (i) <u>Engaging in interstate commerce</u>

The parties agree that SBC receives its canned and bottled product and kegs from various in-state and out-of-state suppliers on shrink-wrapped pallets. Doc. 38-30 at 2-4. The evidence is undisputed that SBC receives products from more than

---

[7] Baker failed to offer any response on this issue and instead asserts only that "the parties dispute whether . . . [SBC] was engaged in interstate commerce," and "the second prong necessary for [the] MCA exemption was also not met." Doc. 51 at 15, 24. Accordingly, the court concludes that Baker has waived this issue. *McCain v. Imery's Carbonates LLC*, No. 1:11-CV-25-VEH, 2013 WL 535541, at *5 (N.D. Ala. Feb. 7, 2013) (plaintiff waived an issue in failing to respond to defendant's arguments at summary judgment phase).

200 suppliers, which it orders based on a "forecasting system that includes past [seasonal] sales data," and at least 75% of its sales are of products it receives from out-of-state suppliers. *Id*. at 2, 4. Once it receives the pallets from a supplier, SBC unpacks and sorts some pallets for further distribution to restaurants and retail outlets in Alabama, and maintains some shrink-wrapped pallets in their original form for delivery directly to the customer. *Id*. at 2-3. The pallets stay in SBC's warehouse as inventory for an indeterminate amount of time (but typically no more than 30 days) until a customer places an order requesting the particular product, at which point SBC's drivers deliver them to various restaurants and retail outlets. Doc. 38-19 at 19. Upon delivering the products, the drivers collect the empty pallets and return them to the warehouse, and, according to SBC, in some situations where the empty pallets are "identifiable as from a specific supplier"— for example, where the pallets are marked with a particular supplier's logo—SBC will ship the pallets back to the supplier "once it has collected a sufficient number of pallets."[8] Doc. 38-30 at 3. The driver also collects empty kegs from customers and returns them to the warehouse, and once SBC collects enough empty kegs to be refilled by a specific supplier, SBC sends the empty kegs to that supplier, and the supplier ships the refilled kegs back to SBC. *Id.* The majority of the pallets and kegs that SBC collects are sent to out-of-state suppliers. *Id.*

---

[8] Baker disputes that the pallets are sent back to suppliers and contends that SBC and its customers "retain the pallets for their own use." Doc. 51 at 2.

SBC, while conceding that it ships products to customers only within the state of Alabama, claims that its business operations are a part of a "practical continuity of movement" across state lines because it distributes out-of-state products within Alabama, or, alternatively, that SBC meets the interstate commerce requirement because it collects and exports empty pallets and kegs out-of-state. Doc. 37 at 20-25. SBC is correct that "transportation within a single state may remain 'interstate' in character when it forms a part of a 'practical continuity of movement' across state lines from the point of origin to the point of destination." *Walling v. Jacksonville Paper Co.,* 317 U.S. 564, 568 (1943). Critically, the characterization of such transportation depends upon the "essential character" of the shipment, *Texas N.O.R.R. v. Sabine Tram Co.,* 227 U.S. 111, 122 (1913), and the crucial factor in determining the essential character of a shipment is "the shipper's fixed and persisting intent at the time of shipment" based on a totality of the facts and circumstances of each case, *Cent. Freight Lines v. I.C.C.,* 899 F.2d 413, 419 (5th Cir. 1990) (citing *Texas v. United States,* 866 F.2d 1546, 1556 (5th Cir.1989)). *See also* 29 C.F.R. § 782.7(b)(2) (intrastate transportation can satisfy the interstate commerce requirement of the MCA if the shipper has a "fixed and persisting transportation intent beyond the terminal storage point at the time of shipment").[9]  However, in the case at hand, the court does not need to

_____

[9] In determining whether a shipper has the relevant "fixed and persistent intent," courts have applied a three-prong

reach a conclusion regarding the "fixed and persistent intent" issue SBC's regular

practice of shipping kegs to its out-of-state suppliers meets the interstate

requirement.[10] As courts have held, the "regular pick up of empty containers

destined for out-of-state bottling facilities . . . place[s] employees in interstate

commerce and exempt[s] them from the overtime provisions of the FLSA under

the motor carrier exemption." *Thomas v. Wichita Coca-Cola Bottling Co.*, 968

F.2d 1022, 1025 (10th Cir. 1992). *See also Baez v. Wells Fargo Armored Serv.*

*Corp.*, 938 F.2d 180, 181 (11th Cir. 1991) (citing *Opelika Royal Crown Bottling*

*Co. v. Goldberg*, 299 F.2d 37, 40 (5th Cir. 1962) (return of empty bottles to

test. *See Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670, 672 (10th Cir. 1993); *California Trucking Ass'n v. I.C.C.*, 893 F.2d 1338 (9th Cir. 1989); *Baird v. Wagoner Trans. Co.,* 425 F.2d 407 (6th Cir.1970), *cert. denied,* 400 U.S. 829, 91 S.Ct. 58, 27 L.Ed.2d 59 (1970); *Ashby v. Nat'l Freight, Inc.*, No. 807-CV-898-T-30MSS, 2008 WL 3981422, at *5 (M.D. Fla. Aug. 22, 2008). *See also Determination of Jurisdiction over Transportation of Petroleum and Petroleum Products by Motor Carriers Within a Single State,* 71 M.C.C. 17, 29 (1957). Under this test, the major factors that could preclude single-state transportation from being considered interstate in nature are (1) that there is no specific order destined for a specific destination at the time of shipment (in this case, the shipment from the supplier to SBC); (2) that the terminal storage (here, SBC's warehouse) is a distribution point or local marketing facility; and (3) that transportation from hub to spoke is arranged only after sale or allocation from storage. *Cent. Freight Lines v. I.C.C.*, 899 F.2d 413, 421 (5th Cir. 1990).

[10] The court notes, however, in a case with facts nearly identical to those at hand with respect to SBC's distribution scheme, the Fourth Circuit held that a wholesale beer distributor's operations met the "practical continuity of movement" standard. *See Talton v. I.H. Caffey Distrib. Co.*, 124 F. App'x 760, 765 (4th Cir. 2005) (distributor receives 50% of the products it sells from out-of-state suppliers, orders from suppliers based on predictions regarding customer needs, and stores the products in its warehouse until customers place an order). Baker attempts to distinguish *Talton* by offering a misplaced comparison: that SBC "does not have an exclusive relationship with its retail customers" like the distributor in *Talton* because SBC's customers "do not have contracts with [SBC] and they are free to buy beer and other products from other wholesalers." Doc. 51 at 19. *See also* doc. 38-19 at 27. However, Baker overlooks that the beer distributor in *Talton* also did not have contracts with its customers, and in fact state law "prohibited . . . [wholesale beer distributors] from requiring a retailer to purchase their beer pursuant to a contractual purchase agreement." *Talton,* 124 Fed. App'x at 761. Significantly, the appropriate comparison between the cases lies in the fact that SBC undeniably has "exclusive territorial assignments" and distributor agreements which dictate that customers within a particular territory must purchase a particular brand of product from the distributor with the exclusive right to sell that particular brand in the territory. Doc. 38-30 at 1-2. Similarly, the distributor in *Talton* was "the exclusive distributor for certain beer products . . . for several North Carolina counties." *Talton,* 124 Fed. App'x at 761. Furthermore, even accepting that SBC's customers can purchase some of their products (i.e., brands for which SBC does not enjoy an exclusive distribution right) from other distributers, this does not negate a conclusion that the products that SBC *does* sell to customers are in "practical continuity of movement" across state lines.

supplier creates a "sufficient channel of interstate commerce" where the return of bottles is "an integral part of the [employer's]" business)). While the parties seemingly disagree regarding whether SBC returns empty pallets to out-of-state suppliers as a regular or integral aspect of its operations, the record is undisputed with respect to the regularity with which SBC ships kegs to out-of-state suppliers. Specifically, Baker admits that he collected "three or four" empty kegs a week and offers no evidence to dispute testimony from SBC's Chief Financial Officer, James Hall, that SBC "accumulates [the kegs] into truckload quantities and send[s] them back to the supplier," that keg sales constitute a "significant" percentage of SBC's sales, and that over 75% of SBC's total sales are of products from its out-of-state suppliers. Doc. 38-19 at 25. Significantly, Baker testified that he has no knowledge of where SBC sends the kegs that its drivers collect, doc. 38-1 at 23, and the record is undisputed that SBC ships "the majority of the [empty] kegs" to out-of-state suppliers. Doc. 38-30 at 3. Accordingly, the court concludes that SBC meets the interstate commerce requirement of the motor carrier exemption in light of its regular export of empty kegs to out-of-state suppliers.

(ii) Class of work involved in Baker's job

Next, Baker contends that SBC does not satisfy the second prong of the motor carrier exemption because SBC "did not require its drivers to complete Department of Transportation ("DOT") logs recording the time they spent

driving." Doc. 51 at 24. However, Baker provides no support for the proposition that an employer's failure to log its drivers' time necessarily means that those drivers' business-related activities do not directly affect "the safety of operation of motor vehicles." Baker merely cites to a case where the Tenth Circuit found that the truck drivers' duties in that case "affected the safety of operations" because the employer "complied with DOT regulations concerning preemployment physicals, log books, . . . driving tests and drug testing," which subjected the drivers "to the power of the Secretary of Transportation." *Thomas*, 968 F.2d at 1026. Baker's reading of the *Thomas* case overlooks that the court did not indicate that the employer's compliance specifically with regulations concerning log books was alone determinative or central to the court's decision. *See id.* In any event, the court notes that the record in this case is undisputed with respect to SBC's compliance with various DOT regulations relating to its drivers, including requiring drivers to submit to pre-hire physical examinations, and pre-hire and random alcohol and drug testing, doc. 38-31 at 2, much like the employer in *Thomas*. *See Thomas*, 968 F.2d at 1026. Ultimately, because courts have consistently held that the duties of a delivery driver "directly affect highway safety whenever he drives a motor vehicle in interstate or foreign commerce," *Alvarado v. I.G.W.T. Delivery Sys., Inc.*, 410 F. Supp. 2d 1272, 1277 (S.D. Fla. 2006) (citing *Levinson v. Spector Motor Service,* 330 U.S. 649, 669 (1947)), the court rejects

Baker's argument that he did not "engage in activities of a character affecting [the] safety" of operation of motor vehicles in interstate commerce, doc. 51 at 22.  *See also* 29 C.F.R. § 782.3(b) ("The work of an employee who is a full-duty or partial-duty 'driver,' . . . directly affects 'safety of operation' . . . whenever he drives a motor vehicle in interstate or foreign commerce within the meaning of that act.")

For these reasons, because SBC is a motor carrier engaged in interstate commerce whose activities directly affect the safety of operations of such motor vehicles, and because Baker's business-related activities as a delivery driver directly affect the safety of operation of motor vehicles, the court concludes that the motor carrier exemption applies in this case. Accordingly, the court will grant summary judgment with respect to Baker's claim for unpaid wages under the FLSA. *See Walters*, 575 F.3d at 1226.

### b.  FLSA retaliation

SBC next contends that Baker's retaliation claim fails because Baker cannot establish a *prima facie* case of retaliation, or, alternatively, because SBC articulated a legitimate, non-pretextual reason for the discharge. Doc. 37 at 25. Indeed, while the FLSA protects persons against retaliation for asserting their rights under the statute, *see* 29 U.S.C. § 215(a)(3), Baker carries the burden of establishing a *prima facie* case by showing that (1) he engaged in activity protected under the FLSA, (2) he subsequently suffered adverse action by the employer, and

(3) a causal connection existed between the employee's activity and the adverse

action. *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342-1343 (11th Cir. 2000).

Unfortunately for Baker, he cannot establish a *prima facie* case because he

did not engage in a protected activity. In reaching this decision, the court accepts

as true Baker's contentions that he repeatedly complained about the failure to pay

him overtime, including on the last day that he worked for SBC. Doc. 38-1 at 110,

111, 112, 118. However, in order for Baker's complaints to qualify as a "protected

activity," Baker must establish that he "reasonably believed" SBC was engaging in

conduct that is unlawful under the FLSA. *See Harper v. Blockbuster Entm't Corp.,*

139 F.3d 1385, 1388 (11th Cir.1998). Significantly, this "reasonable belief"

element has an objective and a subjective component. *See Little v. United*

*Technologies, Carrier Transicold Div.,* 103 F.3d 956, 960 (11th Cir.1997). Stated

differently, Baker "must not only show that he subjectively . . . believed that his

employer was engaged in unlawful employment practices, but also that his belief

was objectively reasonable," and the "objective reasonableness" of Baker's belief

is "measured against existing substantive law." *Clover v. Total Sys. Servs., Inc.,*

176 F.3d 1346, 1351 (11th Cir.1999).  In applying this "objective reasonableness"

test, the Eleventh Circuit has held that, where courts have concluded with

unanimity that an employer's conduct is lawful, a plaintiff's belief that his

employer engaged in an unlawful employment practice was not "objectively

reasonable," and the plaintiff's complaints therefore did not qualify as "protected activity." *See Harper*, 139 F.3d at 1388. *See also Burnette v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1135 (N.D. Ga. 2004) (citing *Harper*, 139 F.3d at 1388) (finding plaintiff's belief that employer violated FLSA objectively unreasonable in light of Eleventh Circuit case law and the law of other circuits establishing that employer's conduct was lawful). Based on these principles, and because the law of this Circuit and other circuits provides that SBC was not required to pay overtime wages to Baker under the motor carrier exemption, the court concludes that Baker cannot establish that he engaged in a protected activity. Accordingly, SBC's motion on Baker's FLSA retaliation claim is due to be granted.[11]

## 2. *Section 1981 disparate treatment and hostile work environment claims*

Baker's Section 1981 claims rest on two contentions: (1) as to the hostile work environment claim, that he "heard the word 'n*****' at [work] all the time;"

---

[11] The motion is also due to be granted because SBC articulated a legitimate non-retaliatory reason for the discharge—Baker's admitted failure to complete his assigned deliveries—which Baker failed to rebut. *See Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342-1343 (11th Cir. 2000*). Baker attempts to establish that SBC's articulated reason was pretextual by pointing to the conversation that Lowe overheard between Lankford and Marshall Nichols—who were purportedly talking about firing Baker on his last workday—which prompted Lowe to opine that "they were out to get" Baker, presumably because he had complained about overtime. Doc. 51 at 29; doc. 51-1 at 3. Even accepting that Lowe overheard this conversation, the fact that Lankford and Nichols discussed discharging Baker on the day that Baker returned the two stops is not the sort of evidence that suggests "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in SBC's proffered reason suggesting that the reason is pretextual. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997). Rather, this evidence is wholly consistent with the contention that SBC discharged Baker for returning the stops since Baker does not identify any aspects of the conversation that suggest any other reason for his discharge. *See* doc. 51-1 at 3-4. Furthermore, to the extent Baker contends the fact that he had "two customer stops more than usual" on his truck that day establishes pretext because Lankford was "setting him up" for termination, s*ee* doc. 51 at 29, Baker points to no record evidence establishing that he was the only driver assigned two extra stops that day, or that other drivers were assigned extra stops but not discharged for failing to complete them, or any other scenario tending to show that the two extra stops were a "set up." Ultimately, the court has carefully reviewed the evidence before it and finds no evidence of pretext.

and (2) as to the discrimination claim, that SBC discharged him because of his race and that "the articulated reason for [his] termination is [pretextual] because [SBC] has falsely claimed that [Creel] was the decision maker who terminated Baker's employment." *See* doc. 51 at 30. Even accepting these facts as true for summary judgment purposes, aside from offering various unsubstantiated legal conclusions, Baker does not elaborate on these issues, or cite to any legal authority to explain their relevance or significance. For example, with respect to the hostile work environment claim, Baker does not even address the last and key element of his *prima facie* case: that a basis exists to hold SBC liable for the alleged conduct. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999). To be sure, because there is no burden on this court "to distill every potential argument that could be made based upon the materials before it on summary judgment . . . [and] the onus is upon the parties to formulate arguments, grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), *cert. denied,* 516 U.S. 817 (1995). *See also Wilkerson v. Grinnell Corp.,* 270 F.3d 1314, 1322 (11th Cir.2001) (finding claim abandoned where plaintiff alleged the claim in complaint but did not address it in response to motion for summary judgment); *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1325 (11th Cir. 2000) (finding claim effectively abandoned before the

district court where party did not present any argument on that claim in its response to motion for summary judgment); *Crayton v. Valued Servs. of Alabama, LLC*, 737 F. Supp. 2d 1320, 1330 (M.D. Ala. 2010) ("Plaintiff's failure to address Defendant's many arguments with respect to perceived infirmities with her . . . claims amounts to an abandonment of such claims."). On this basis alone, SBC's motion with respect to Baker's Section 1981 claims is due to be granted. Nonetheless, in the interest of thoroughly addressing Baker's claims, the court has carefully reviewed the record before it and concludes that summary judgment is also appropriate for the reasons below.

     a.  *Race discrimination*

Baker's race discrimination claim—which, according to Baker's response, is based solely on his discharge, *see* doc. 51 at 27-28,[12]—fails because he cannot establish the requisite discriminatory animus. *See Clark v. Huntsville City Bd. Of Educ.*, 717 F.2d 525, 529 (11th Cir. 1983) (to prove discrimination, a plaintiff "must convince the court that [defendant] operated . . . with a racially discriminatory motive, purpose, or animus"). By Baker's own contentions, SBC discharged him for reasons unrelated to his race, i.e., because he "got on [his

---

[12] While Baker does not state so explicitly in his response, the court concludes that his race discrimination is based solely on his discharge because the only argument he makes in his response is that he can establish a *prima facie* case of discrimination because he heard the "N" word at work "all the time" and because "the articulated reason for Baker's termination is pretextual." Doc. 51 at 27. The court reads this as Baker's attempt to establish a discriminatory discharge claim by (1) showing that SBC had the requisite discriminatory animus in light of Lankford's use of "N" word, and (2) rebutting SBC's articulated reason for his discharge. Because Baker does not offer any response to SBC's arguments with respect to pay discrimination and disparate work assignments, Baker has waived those issues. *See McCain*, 2013 WL 535541, at *5.

supervisor's] nerves" in "asking so much" and complaining about unpaid overtime. *See* doc. 38-1 at 117. Therefore, the race discrimination claim fails. Alternatively, if Baker is perhaps suggesting the fact that one of his supervisors (Lankford) used the "N" word and "liked to tell racial jokes," doc. 38-1 at 81, 85, alone establishes discriminatory animus, summary judgment is nonetheless appropriate because Baker failed to show that his supervisor's alleged conduct motivated his discharge. The closest Baker comes as far as this court can discern is his contention that SBC falsely claimed Creel was the one who discharged Baker. Doc. 51 at 30. Presumably, Baker is contending that Lankford actually made the decision to discharge him or played a role in his discharge. Even if Baker is correct, Lankford's involvement does not relieve Baker from his burden of rebutting SBC's articulated reasons for his discharge, i.e., Baker's failure to complete his assigned deliveries. *See Clark*, 717 F.2d at 529 ("Only when [defendant's] articulated reason is pretext for accomplishing a racially discriminatory purpose will the plaintiff recover.") (citation and internal quotation marks omitted). Ultimately, while Baker believes that he had valid reasons for not completing his deliveries (illness, long hours, etc.) and that he followed the proper procedure for returning the stops, the fact remains that he did not complete the deliveries and he has not shown that SBC discriminatorily enforced its policy. *See Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) ("[Plaintiff] may

have shown that he was fired for violating a rule that he did not violate. But Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules."). More importantly, this court is not a super personnel board and is precluded from second-guessing an employer's business decisions. *Alexander v. Fulton Cnty.*, 207 F.3d 1303, 1341 (11th Cir. 2000) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions."). Accordingly, because an employer may discharge an employee "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason," *Nix*, 738 F.2d at 1187, and in the absence of any arguments from Baker to support his race discrimination claim, summary judgment is due to be granted.

> ### b.  Racial harassment

Baker claims he was subjected to repeated uses of the "N" word. Doc. 51-1 at 4.  Specifically, Baker purportedly heard Lankford use the "N" word "all the time" when telling racially inappropriate jokes "talking about blacks and n******." Doc. 38-1 at 81. When asked the number of times he heard Lankford use the "N" word, Baker estimated five times. *Id*. Baker also heard Marshall Nichols use the "N" word once, and frequently heard Lankford and Nichols "talk the way they talk," i.e., telling racially inappropriate jokes. *Id*. at 89. Finally, Baker recounts that he heard Mike DeArman, a co-worker, use the "N" word on one or

two occasions, that once or twice a week, DeArman would "use racial slurs" about "the n*****, the African," and that DeArman oftentimes, in Baker's opinion, stopped just short of "saying the 'N' word." *Id*. at 91-92. The alleged language is offensive and simply has no place in civilized society, let alone the workplace. As one court aptly put it, "far more than a 'mere offensive utterance,' the word '[n*****]' is a pure anathema to African–Americans," and perhaps "no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as '[n*****]' by a supervisor in the presence of his subordinates." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) (citation omitted). Given the prevalence of this alleged conduct, the court disagrees with SBC that this evidence—use of the "N" word at least eight times and repeated racially inappropriate jokes about "blacks" and "Africans"—describes "mere offensive utterances" and that Baker cannot establish the severe and pervasive requirement necessary for a hostile work environment claim. *See* doc. 37 at 36-37.

Nonetheless, despite the evidence of clear severe and pervasive abuse, to prevail, Baker must still establish that a basis exists to hold SBC liable for the actions of Lankford, Nichols and DeArman. *Mendoza*, 195 F.3d at 1245. Unfortunately, Baker cannot do so in this case because, while an employer can generally be liable for harassment by a supervisor with immediate authority over

an employee (in this case, Lankford), the employer is not liable where (1) it exercises reasonable care to prevent harassing behavior, such as, by promulgating an anti-harassment policy that it distributes to its employees; and (2) the employee fails to take advantage of preventative or corrective opportunities that the employer offers. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1286 (11th Cir. 2003).[13] And indeed, SBC undeniably promulgated an anti-harassment policy which articulated that employees should complain to SBC's human resources manager or Chief Financial Officer, doc. 38-1 at 157, Baker acknowledged receiving that policy in the employee handbook, doc. 38-3 at 12, and Baker admittedly failed to complain to the persons designated in the handbook, *see* doc. 38-1 at 90, 91, 167. In failing to do so, Baker acted unreasonably because "once an employer has promulgated an effective anti-harassment policy and disseminated that policy and associated procedures to its employees, then 'it is incumbent upon the employees to utilize the procedural mechanisms established by the company specifically to address problems and grievances.'" *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1298, 1300 (11th Cir. 2000) (quoting *Farley v. American Cast Iron Pipe,* 115 F.3d

---

[13] While this rule, the *Faragher* defense, does not apply where "the supervisor's harassment culminates in a tangible employment action, such as discharge," *Faragher v. City of Boca Raton*, 524 U.S. 775, 808 (1998), Baker's discharge in this case does not preclude application of the *Faragher* defense because he has not shown that he was terminated based on his race rather than his failure to complete his deliveries. *See Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1281-82 (11th Cir. 2003) (*Faragher* defense applied in a sex harassment case where "there [was] no evidence that [employer], or any of the employees acting on its behalf, considered [plaintiff's] gender when the company terminated her").

1548, 1554 (11th Cir.1997)). Accordingly, summary judgment is appropriate with respect to Baker's hostile work environment claim.

## IV. CONCLUSION

For the reasons stated above, SBC's motion for summary judgment is due to be granted. The court will enter a separate order consistent with this opinion.

**DONE** the 15th day of December, 2014.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE